IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT M. HUNT,<br><br>　　　　　　Petitioner,<br><br>vs.<br><br>DEBBIE ASUNCION, Warden, California<br>State Prison, Los Angeles County,[1]<br><br>　　　　　　Respondent. | No. 2:16-cv-00075-JKS<br><br>MEMORANDUM DECISION |

Robert M. Hunt, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254. Hunt is in the custody of the California

Department of Corrections and Rehabilitation and incarcerated at California State Prison, Los

Angeles County, in Lancaster, California. Respondent has answered, and Hunt has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

Hunt and his co-defendants Marquice Wallace and Kalief Taylor were convicted of the

March 17, 2010, murder of 17-year-old Marque Johnson, a rival gang member. On direct appeal

of his conviction, the California Court of Appeal recounted the following facts underlying

Hunt's case:

> *Gang Rivalry*
> 　　　Beginning in around 2000, gang families from Oakland moved to South
> Sacramento, many to Franklin Villa, known as G Parkway. The area had previously been
> run by the Crips gang. The Oakland gangsters took the name GMOBB and went to war
> with the Crips. GMOBB allowed local males to join under the GMOBB umbrella. The
> local group began as BAY (Bad–Assed Youngsters) and morphed into STARZ or
> STARZ Up. Another subset of the gang, composed of boys aged 14 to 16, was known as

---

[1] 　　　Debbie Asuncion is substituted for J. Soto as Warden, California State Prison, Los
Angeles County. FED. R. CIV. P. 25(d).

Guttah Boys.  As time went by, some members of the Crips gang formed an alliance with STARZ.

GMOBB's rival is the Bloods gang and its various subsets, Ridezilla, FAB, and GUNZ or GUNZ Up, which started in 2007.  The rivalry between GUNZ Up and STARZ Up/Guttah Boys became very violent.  Between May 2008 and July 2010, law enforcement attributed 26 shootings as occurring between these two gangs.

### Wallace's March 8, 2010, Shooting of Taylor (Counts 1 & 2)

On March 8, 2010, a woman who lived on Mack Road heard yelling.  She looked out her window and saw a group of young African–American men yelling and running around; one had a gun in his hand.  She called 911.  She heard a shot; she saw a man fall and another kick him.  The assailants fled.

A police officer was dispatched after the report of a fight.  When he arrived, the fight was over.  Taylor approached him and said he had been shot.  Taylor was not cooperative or forthcoming with information about how the injury occurred.  The officer observed a small entry wound on Taylor's shoulder and called the medics.

Mya Leggett, a trauma surgeon at Kaiser South, treated Taylor.  He had a gunshot wound in his left shoulder and a bullet lodged in his chest.  Taylor returned to the hospital approximately 10 days later to have the bullet removed. Dr. Leggett gave the bullet to the police.  This bullet came from a different gun than the one later used to kill Johnson.

Samara Adams, who knew all three defendants, later told the police that Taylor came to her apartment after he left the hospital.  He told her that Wallace had shot him. Separately, Wallace admitted to Samara that he had shot Taylor.[FN2]

> FN2.   At trial, Samara admitted she was familiar with the situation in which Wallace shot Taylor.  She remembered Taylor coming to her apartment in his hospital gown, but she claimed not to remember telling the police that Taylor said Wallace shot him or that Wallace admitted the shooting.

At trial, the gang expert testified this shooting was part of an altercation between STARZ Up and the rival Oak Park Bloods.  The report of the incident indicated that Wallace and Taylor were being assaulted when the shooting occurred.

In his interview with the police (played only to his jury), Wallace at first denied shooting Taylor. Later, he said Taylor gave him the gun.  They were confronted by a group from Oak Park who hit Taylor, so Wallace pulled out the gun and it accidentally discharged.  He was not aiming at or trying to shoot anyone.

### March 10, 2010, Shooting (No Counts)

On March 10, 2010, Julian Williams was shot at Mack Road and Center Parkway. The suspected shooter was Isaiah Hale.  When Hale was taken into custody at the Aspen Apartments, Taylor was present.  An officer investigating the shooting saw a young Hispanic male, Luis Alcazar, enter the apartments.  Alcazar left two minutes later; he was walking awkwardly and wearing a big sweatshirt that appeared to have something under

2

it.  Alcazar testified Hunt told him to retrieve a gun thrown from the window when Hale was arrested.  He told the police that on the day of Johnson's murder, Hunt had a black .380 gun, the same gun Alcazar had retrieved the day Hale was arrested.  One of the bullets that hit Johnson was fired from the same gun as the bullet that struck Williams.

It was stipulated that Hunt, Taylor, and Wallace were never suspects in the shooting of Williams.

### Taco Bell Incident (No Counts)

There was an altercation at a Taco Bell Restaurant on Mack Road about March 15, 2010.  A group of three males were eating their food when a larger group of eight or nine, who did not frequent that Taco Bell, came in and it got "rowdy."  The three eating their food tried to avoid a confrontation.  A man with long braids was the rowdiest.  The altercation lasted 10 minutes; the manager asked them to leave, pointed out the cameras, and threatened to call the police.  The manager identified photographs of some of the participants, who were gang members.  The "rowdiest" was Tony Morgan, a validated 29th Street Crip, one of the Crip cliques that has alliances with STARZ Up and GMOBB.  The manager was unsure if Hunt was there, and said Wallace was "possibly" there.

Wallace told the police he and Hunt, and possibly Taylor, were at the Taco Bell.  "We was [sic ] all talking shit."  Wallace thought the people they were arguing with were from the Valley High Pirros gang; he was not quite sure.  The gang expert opined this altercation was between the rival gangs GUNZ and STARZ.

### Murder of Marque Johnson (Count 3)

Stephen McDowell, then age 14, lived at the Aspen Apartments at Mack Road and Summersdale with his mother.  The morning of March 17, he was walking to catch the bus on Mack Road to school.  Three African–American men walked past.  One asked for a dollar and another for a condom. McDowell said no.  The men went around the corner and McDowell heard three gunshots.  The three men were in their 20's and had dreadlocks.  One was lighter skinned and wore a blue jacket; the others were darker.

Charity Martin also lived at the Aspen Apartments and was getting ready for school.  As she walked out her door, she heard three or four gunshots.  She stepped out and looked left.  She saw two young men in hoodies or black jackets peeking around the building towards Summersdale.  It looked like they were hiding a weapon.  One said, "[I]s he still down?  If he's not down, we could do some more."  She tentatively identified Taylor as one of these two men.  She walked out of the apartment and saw a young man on the ground.

Also hearing the shots were Christy Adams and her daughter Samara, who lived at the Aspen Apartments.  Samara looked out the window and saw Taylor and two friends running.  Taylor knocked on the window and she let all three defendants in.  They saw a report of the shooting on television and one of defendants recorded it on his cell phone.

Luis Alcazar, the teen who retrieved the gun after the Williams shooting, was at the Adams's apartment that morning.  He testified at trial that Taylor came first alone and Hunt and Wallace followed a minute later.  Hunt and Wallace looked like they had been

running.  Hunt had a black .380 gun and Wallace had a chrome gun.  It looked to Alcazar as though Taylor had two guns in his back pocket.  Defendants wrapped the guns in a T-shirt and gave them to Alcazar to hide in the boiler room.  Later, Taylor took the guns when he left.

When the police arrived, 17–year–old Marque Johnson was down but still breathing.  Johnson had two gunshot wounds, one to his chest and the second to his lower left leg.  He died from the gunshot wound to the chest.  The police found three spent .380 shell casings at the scene.

### Taylor's Possession of a Loaded Gun (Count 5)

As part of the murder investigation, a gang detective was assigned to conduct surveillance of a white Oldsmobile on March 19.  He followed the car to a McDonald's Restaurant on Mack Road and Valley High.  The driver was Douglas Livingston, a known STARZ Up member, and Taylor was the front passenger.  There were two female passengers in the rear.  The detective moved in front of the Oldsmobile and directed marked police cars behind it to activate their lights and sirens.  The Oldsmobile then passed the detective's car.  The Oldsmobile approached the curb and drove "right along the curb line of Florin Road."  It then turned into the entrance to the light rail, attempting to evade the marked units, but the marked units caught up and stopped the car.  During the time that the car was driving along the right curb line, the detective had a better view of the driver's side than he did of the passenger side, and he did not see the driver's arm come out of the car.  He testified (with no objection imposed) that had the driver's arm come out of the window or had the driver even made a gesture, he (the detective) would have seen it.

Officers searched the area immediately adjacent to the stretch of Florin Road where the car had hugged the right curb, travelling onto the shoulder.  They found a loaded .44 revolver about 20 to 30 feet from where the passenger side of the car had been. The handle of the gun was damaged or missing and there were "fresh scrapes" on the cylinder.  None of the occupants of the car was the registered owner of the gun.

### Arson (Count 4)

After Johnson's murder, a memorial to him was erected on Summersdale Drive, consisting of pictures, candles, flowers, and stuffed animals.  On March 19, 2010, there was a small fire at the memorial.  A fire fighter easily put it out.

Samara told the police that Wallace told her he spit on the memorial and lit a fire. He came and got her to show her the fire.  He told her he "didn't like the boy" because he was GUNZ.  Wallace yelled something disrespectful; afterwards he was nervous.[FN3]

FN3.   At trial, Samara did not recall telling the police any of this.

In his interview with the police (played only to his jury), Wallace said he spat on pictures at the memorial and urinated close to it.  He said someone else set the fire.

### Gang Expert

Detective Scott MacLafferty testified as an expert in African–American street gangs within the Sacramento area.  He detailed the history of GMOBB and its subsets STARZ Up and Guttah Boys, and the rivalry with GUNZ Up.  He testified Hunt was a validated STARZ and GMOBB member.  In his opinion, Taylor was a STARZ Up gang member.  Taylor had admitted his membership.  Wallace was not a validated STARZ member, but was a member of the organization under the Guttah Boys.  MacLafferty had previously interviewed the victim Johnson.  Johnson was a member of GUNZ Up, but MacLafferty did not know if Johnson had ever "put [ ] in work" for the gang by committing crimes.

In MacLafferty's opinion, the killing of Johnson was gang related.  He explained that in the gang context the most important thing was the concept of respect.  It was a forced respect based on fear and intimidation.  Gang members spread fear by committing crimes against each other.  The crimes are very violent and often occur quickly.  Gang members prepare themselves for this violence by always being with others and making sure at least one in the group has a gun.  A gang member did not want to get caught "slippin'," that is, alone and without a gun.  MacLafferty believed that Johnson had been caught "slippin'."  The investigation of the Johnson murder found no motive for the killing other than gang rivalry.

MacLafferty discussed the group dynamic factor in gang-related crimes.  Almost all these crimes involved multiple people.  The group dynamic impacted the likelihood that a crime would occur.  The prosecutor posed a hypothetical of three STARZ members walking around armed before 7:00 a.m. on a Wednesday, and asked if that was an example of gang members prepared and looking for an opportunity to attack a rival.  MacLafferty said yes.

MacLafferty believed the other charged crimes were also gang related.  The fire at the memorial was a form of disrespect, intended to increase the level of fear and intimidation.  Wallace's shooting of Taylor was gang related because it was part of an altercation between STARZ Up and the rival Oak Park Bloods.  Taylor's throwing the gun from the car was gang related because gun possession was a primary activity of STARZ Up.

### Wallace Interview

Wallace's interview with the police was played only to his jury.  Wallace admitted he was present at Johnson's shooting.  Taylor had called him and Hunt that morning around 6:30 a.m. to meet on Mack Road at the doughnut shop.  Defendants first asked a kid for a condom and a dollar.  They then asked Johnson for some marijuana and he responded, "fuck no."  Wallace claimed Hunt argued with Johnson, shot him, and then hid the gun.

### Hunt and Taylor Joint Interview

The police conducted a joint interview with Hunt and Taylor, parts of which were played only to their jury.  Taylor claimed the argument was between Johnson and Wallace. Both Hunt and Taylor claimed they were on the phone during the argument and

didn't know anything about the shooting.  After the People had rested their case, and both defendants had also rested, the People called Detective Heinlein to testify that in the joint interview both Taylor and Hunt said "no" when asked if Wallace was the shooter.  Hunt then added that he only said "no" because Taylor said "no."

*People v. Wallace*, Nos. C070933/C070914, 2014 WL 4783222, at *1-5 (Cal. Ct. Appt. 2014).

After trial, a jury found Hunt guilty of first-degree murder with firearm and gang

enhancements, including that he personally discharged a firearm causing death, and a gang

special circumstance.[2]  Hunt was subsequently sentenced to life imprisonment without the

possibility of parole plus 25 years to life.[3]

Through counsel, Hunt and his co-defendants appealed their convictions, challenging the

sufficiency of the evidence of their murder convictions and the admissibility of certain testimony

of the gang expert.  Hunt also argued that the trial court erred by: 1) admitting Taylor's

statements from a joint police interview in violation of *Aranda/Bruton*;[4] 2) admitting as rebuttal

evidence his and Taylor's exoneration of Wallace; and 3) instructing the jury on premeditation

---

[2]     The same jury found Taylor guilty of second-degree murder with gang and firearm enhancements as well unlawfully carrying a loaded firearm with a gang enhancement.  A separate jury found Wallace guilty of first-degree murder with firearm enhancements and gang enhancements and a gang special circumstance.  In connection with the shooting of Taylor and setting fire to a memorial for Johnson, Wallace's jury also found him guilty of assault with a firearm, with an enhancement for personal use of a firearm, negligent discharge of a firearm, and arson.

[3]     The trial court likewise sentenced Wallace to life without the possibility of parole plus 25 years to life plus 7 years and 8 months in prison.  The court sentenced Taylor to 40 years to life imprisonment plus 5 years.

[4]     *See People v. Aranda*, 407 P.2d 265 (Cal. 1965) (finding that admission of confession implicating co-defendant in joint trial resulted in miscarriage of justice notwithstanding instruction that confession was admissible only against confessing defendant); *see also Bruton v. United States*, 391 U.S. 123 (1968) (finding that admission of confession implicating co-defendant in joint trial constituted prejudicial error even under circumstances in which trial court gave clear jury instruction that confession could only be used against confessing defendant and must be disregarded with respect to co-defendant).

and deliberation after the jury announced its deadlock.  The Court of Appeal unanimously affirmed the judgment against Hunt in its entirety in a reasoned, unpublished opinion issued on September 25, 2014.[5]  Hunt petitioned for review in the California Supreme Court, which was summarily denied on December 17, 2014.

Hunt timely filed a Petition for a Writ of Habeas Corpus to this Court on November 25, 2015.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Hunt raises the following grounds for relief: 1) his constitutional rights to confrontation and due process were violated by the admission of Taylor's statements from the joint interview; 2) the trial court erred in admitting in the prosecution's rebuttal case his and Taylor's statements that Wallace was not the shooter; 3) there was insufficient evidence to sustain his murder conviction; 4) the trial court's instruction on premeditation and deliberation after jury deadlock reduced the prosecution's burden of proof; and 5) the gang expert's opinion on an ultimate issue invaded the province of the jury and violated Hunt's rights to due process and a fair trial.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

---

[5]     The appellate court reversed count 2 for Wallace and count 5 and the accompanying gang enhancement for Taylor.  Those decisions did not have an affect on Hunt's conviction.

determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that
contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that
are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives
at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)
"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the
relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon
the states; that is, the decision must be based upon constitutional grounds, not on the supervisory
power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where
holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it
cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are
beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.
Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was
correctly applied).  It is a fundamental precept of dual federalism that the states possess primary
authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,
67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and
application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state
court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536
U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Hunt has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

Ground 1.      *Bruton Error*

Hunt first argues that the trial court erred by admitting statements his co-defendant Taylor made during a joint police interview.  In considering this claim on direct appeal, the Court of Appeal laid out the following facts underlying this claim:

> The police jointly interviewed Hunt and Taylor.  Hunt moved for a separate jury and to exclude Taylor's statements.  He argued each defendant's statements implicated the other and were not adoptive admissions.  The People took the position that all the statements were either party admissions (that implicated only the speaker) or adoptive admissions because they put Hunt and Taylor at the scene of the crime.  The trial court determined that the "vast majority" of the joint interview did not constitute adoptive admissions, but admitted, over defense objection, a redacted portion of the interview.

The redacted interview was played to Hunt and Taylor's jury.  In the interview, Hunt and Taylor admitted they went to the doughnut shop with Wallace the morning of the murder.  The detective then asked about the argument immediately before the shooting.  Taylor said the argument was between the victim and Wallace; Hunt said he did not see it because he was on Taylor's phone.  Taylor said he did not see Hunt on the phone, and Hunt did not use his phone.  Hunt said he must have been on Wallace's phone, but Taylor would not confirm that.  Disregarding defendants' quibbling over the phones, the trial court found this portion of the interview was an adoptive admission because both defendants effectively admitted to being at the murder scene—"they are both present and not denying that they were there."  It opined the dispute over the phone was "really of little consequence, I suspect."

In the next admitted portion of the interview, Hunt said Wallace was arguing with the victim and Taylor was also arguing or perhaps trying to break it up.  Hunt claimed he was not paying attention, and then heard shots.  When asked what happened next, Hunt responded, "And we all ran."  Taylor then responded: "I mean, bro, this, bro, like keep it solid gold, bro.  You feel me?  Like niggers, bro.  We all (unintelligible).  We keep playin this game, bro, we just gonna be over, bro. I don't see this, bro, and I'm not—I don't give a fuck no more, bro, cause I'm not gonna play this game, bro.  Already know bro.  Niggers got everybody, bro.  You know I told you my side of the story, bro, already but—" Although the court found Taylor's final statement meaningless other than showing "a lack of articulation," it nonetheless admitted this portion of the interview, which for convenience we will refer to as Taylor's final statement.

*Wallace*, 2014 WL 4783222, at *13-14.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  This rule applies with equal force to statements by a non-testifying accomplice or co-participant.  *See Bruton*, 391 U.S. at 135-36 (holding that the admission of a statement of an accomplice or co-participant that implicates a defendant violates the defendant's Sixth Amendment rights when the defendant has no opportunity to cross-examine the co-participant).

10

Where, however, the accomplice's statement does not directly implicate the

defendant—i.e., the statement is "not incriminating on its face, and [becomes] so only when

linked with other evidence introduced later at trial"—the Constitution does not prohibit the

introduction of the statement. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *see also Mason*

*v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (noting that *Bruton* "specifically exempts a

statement, not incriminating on its face, that implicates defendant only in connection to other

admitted evidence").

The Court of Appeal concluded that Hunt's confrontation rights were not violated by the

admission of Taylor's statements in the joint interview.  The appellate court reasoned:

> Here, the jury was instructed that each defendant's statements were admissible
> against only him unless the jury found the statement was an adoptive admission.  The
> court also instructed the jury on the requirements for an adoptive admission.  Therefore,
> the issue is whether the statements Hunt objects to were adoptive admissions, in which
> case there is no confrontation issue, or if not, whether such statements were "powerfully
> incriminating" and "facially incriminating" such that the jury could not follow the
> instruction to use such statements only against the defendant who made them.  Only if the
> latter is true did the admission of Taylor's statements violate Hunt's right to
> confrontation.
>
> Hunt does not assign error to admission of the portions of the joint interview
> where he and Taylor describe their meeting at the doughnut shop, and Wallace's
> argument with Johnson.  These statements were all party admissions not implicating the
> other or adoptive admissions as both Hunt and Taylor concurred as to the contents of the
> statement.  Hunt does object to Taylor's statements disputing whether Hunt used his
> phone or was using Wallace's phone during the argument and whether Hunt observed a
> "tussle."  The trial court admitted these statements as adoptive admissions because both
> Hunt and Taylor were admitting their presence when Johnson was shot.  Hunt claims
> Taylor was directly contradicting Hunt's story as to precisely what Hunt was doing
> during the shooting.
>
> Although in the end Hunt agreed with Taylor that he must have been using a
> different phone, Wallace's rather than Taylor's, we agree that Hunt did not adopt
> Taylor's statements denying that Hunt was on the phone.  We find, however, that the
> admission of these statements did not violate Hunt's right to confrontation because we
> agree with the trial court that the dispute about Hunt being on the phone was of little
> consequence. While Taylor's statements did slightly dispute Hunt's version of events, the
> statements were by no means "powerfully incriminating."  (*See Bruton v. United States*

(1968) 391 U.S. 123, 135 [20 L.Ed.2d 476].)  In *Bruton*, a witness testified the codefendant confessed that he and Bruton committed the armed robbery.  (*Id.* at p. 124 [20 L.Ed.2d at p. 478].)  The high court found that in this context, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." (*Id.* at p. 135 [20 L.Ed.2d at p. 485].)  Here, the disputed statements do not directly implicate Hunt in the murder; rather, they speak only to his awareness immediately prior. Hunt could have directly observed the argument or "tussle" between Wallace and Johnson (rather than having been on the phone) and still have had no criminal liability for Johnson's murder. Taylor's statements were not "powerfully incriminating" or "facially incriminating" as to Hunt, so there is no reason to conclude the jury could not follow the instruction to consider them only against Taylor.

We also find no adoptive admission of Taylor's final statement.  Because the redacted interview ends at this point, we cannot tell whether Hunt adopted it by words or conduct or at all.  Further, we cannot discern exactly what Taylor is saying.  Hunt argues the final statement indicates that Taylor was not only disputing Hunt's version of events but also claiming that Hunt was evading the truth that he was the shooter.  Hunt reasons that because Taylor had identified Hunt as the shooter in his individual interview with the police, and Taylor made reference in his final statement to having already told his side of the story, the jury could infer that Taylor had identified Hunt as the shooter and his final statement implicated Hunt by challenging his denials.

This reasoning fails, however, because the jury did not hear about Taylor's identification of Hunt as the shooter.  While the probation report contained a description of Hunt's and Taylor's individual interviews with the police, in which Taylor did identify Hunt as the shooter, these interviews were not played to the jury.  Having reviewed the entire trial transcript and the video of the redacted portion of the joint interview, we do not find that the jury would have understood Taylor's final statement to be challenging Hunt for denying his role as the shooter.

The meaning of Taylor's final statement was ambiguous at best, unintelligible at worst, and the jury could easily have interpreted it simply as Taylor expressing his frustration with being questioned by the police.  Given its ambiguous nature, we do not find that it was "facially" and "powerfully incriminating" as to Hunt, such that the jury could not follow the instruction to consider Taylor's statements against only Taylor unless they were adoptive admissions.  We presume the jury followed the court's instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)  Accordingly, admission of Taylor's final statement did not violate Hunt's confrontation rights.

*Wallace*, 2014 WL 4783222, at *15-16.

The Court finds no error in the Court of Appeal's conclusion.  While *Bruton* forbids the

admission of statements made by an accomplice that implicates the defendant, *Bruton*, 391 U.S.

at 126, 135-56, the testimony here did not directly implicate Hunt in the criminal activity.  For

the jury to infer that Taylor implicated Hunt in his statements, the jury would have to rely on other evidence introduced at trial; the statement therefore falls outside of *Bruton*. *See Richardson*, 481 U.S. at 208; *see also Mason*, 447 F.3d at 695.  In any event, a *Bruton* claim, like other Confrontation Clause claims, is subject to harmless error analysis.  *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999); *Harrington v. California*, 395 U.S. 250, 254 (1969).  Under this standard, habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008)  As the Court of Appeal reasonably concluded, the challenged statements were of insignificant value to have a "substantial and injurious effect" on the verdict.  Hunt is therefore not entitled to relief on this ground.

Ground 2.       *Admission of Statements in Rebuttal Case*

Hunt likewise contends that the trial court erred in allowing the prosecution to present, after Hunt and Taylor had rested, evidence that both Hunt and Taylor told the police that Wallace was not the shooter.  Hunt does not argue, however, that the evidence was wholly inadmissible. Rather, Hunt asserts, as he did on direct appeal, that the evidence was not proper rebuttal evidence and that introducing it not during their case-in-chief but at a later stage prejudiced him by allowing the prosecution to unduly emphasize it.  The Court of Appeal recounted the following facts:

> When the parties first discussed admission of the joint interview, the prosecutor referenced a portion of the interview where the detective walked Hunt and Taylor through the events and told them the police did not know who the shooter was.  She stated she could not find the referenced portion at that moment but wanted "maybe" to include it. The court recognized that portions of the interview not expressly admitted at that hearing could become relevant during trial.

>       The People rested their case-in-chief without attempting to admit this portion of
> the joint interview.  Taylor then presented his case, which consisted only of the testimony
> of Detective Bryce Heinlein that when he interviewed Christy Martin, she was wearing
> the jacket that Hunt wore in the video from the doughnut store.  Hunt rested without
> presenting any evidence.
>
>       The court and counsel met outside the presence of the jury to discuss the People's
> request to admit an additional portion of the joint interview to Hunt and Taylor's
> jury—where both Hunt and Taylor said no when asked if Wallace was the shooter.  Hunt
> objected because he subsequently said in the interview that he said no only because
> Taylor did.  The court ruled the additional portion of the interview, including Hunt's
> subsequent retraction, could be admitted.
>
>       After Taylor and Hunt rested their cases, the court asked the prosecutor if she had
> rebuttal evidence.  She said yes, and called Detective Heinlein to testify that during the
> joint interview when Detective Higgins asked Hunt and Taylor if Wallace was the
> shooter, both said "nope."  Higgins then told Hunt and Taylor, "[T]hat's why we are
> here" (suggesting that if Wallace was not the shooter, Taylor or Hunt was).  Hunt then
> claimed that "he only said no" because "[Taylor] said no."
>
>       Hunt objected that Heinlein was not a true rebuttal witness.  The court agreed that
> was "technically correct" but observed that the evidence could not have been introduced
> earlier, as it was the subject of much ongoing discussion amongst the parties and the
> court—they had "hashed it around" for at least a day.  The court declined to explain to
> the jury that this evidence was not true rebuttal evidence, as the jury had already been
> told that the prosecutor would have some additional questions for the detective (because
> Taylor was planning on calling him as a defense witness).

*Wallace*, 2014 WL 4783222, at *16-17.

California Penal Code § 1093 delineates the order that trial procedures may follow in

California state courts.  Penal Code § 1094 grants the trial court broad discretion to depart from

the order specified in § 1093.  In determining that the trial court did not abuse its discretion in its

handling of the rebuttal evidence, the Court of Appeal concluded that the trial court did not err

under §§ 1093 and 1094:

>       We classify the presentation of "rebuttal evidence" as what it really
> was—permitting the People to reopen their case—and find no abuse of discretion.  The
> trial court explained the reason for the delay in presenting this evidence and the
> prosecutor's failure to introduce the evidence earlier, although sloppy, was more
> excusable than the oversight in *Riley*[, 110 Cal. Rptr.3d 585 (Cal. Ct. App. 2010)].
> Neither Hunt nor Taylor claimed to be surprised by the additional evidence, and it was
> not nearly as significant in establishing the case against defendants as that evidence

admitted late in *Riley*, which established an element of the crime charged.  Nothing suggests the prosecutor sought to obtain a tactical advantage by offering this evidence late; rather it appears the delay was caused by inadequate preparation.  Hunt fails to make a convincing showing that the jury placed undue weight on this evidence to his prejudice.

*Id.*, at *18.

This Court is bound by the state appellate court's determination that the trial court did not violate California state law regarding the presentation order of evidence.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  Importantly, Hunt cites to no Supreme Court authority mandating that a prosecutor must present such evidence in its case-in-chief under these circumstances, and the Court is unaware of any.  Hunt thus fails to demonstrate that the state courts' rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), and federal habeas relief is not warranted on this claim.

<u>Ground 3.</u>    *Insufficiency of the Evidence*

Hunt next challenges the sufficiency of the evidence supporting his murder conviction, arguing that there was insufficient evidence of premeditation and deliberation.  As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel*

*v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Under California law, "[m]urder is the unlawful killing of a human being, . . . with malice aforethought." Cal. Penal Code § 187(a). First degree murder includes murder perpetrated by "any . . . kind of willful, deliberate, and premeditated killing[.]" Cal. Penal Code § 189. Attempted premeditated murder requires proof that: (1) the defendant had the specific intent to kill the alleged victim; (2) he committed a direct but ineffectual act toward accomplishing the intended killing; and (3) the defendant acted willfully, deliberately, and with premeditation. *See* Cal. Penal Code §§ 664, 187(a).

The type of evidence which courts have found sufficient to sustain a finding of premeditation and deliberation fall into three basic categories: (1) facts about how and what the defendant did prior to the actual killing which show that the defendant was engaged in activity

17

directed toward, and explicable as intended to result in, the killing (i.e., planning activities); (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim; and (3) facts about the manner of the killing from which the jury could infer a preconceived design to take the victim's life. *People v. Anderson*, 447 P.2d 942, 949 (Cal. 1968). These three categories of evidence are not an exhaustive list, but "provide guidelines" for analysis. *People v. Perez*, 831 P.2d 1159, 1163 (Cal. 1992); *see also Davis v. Woodford*, 384 F.3d 628, 640 & n.3 (9th Cir. 2004) (applying *Anderson* guidelines on federal habeas review but noting admonition of California Supreme Court that *Anderson* did not define elements of first degree murder or definitively state prerequisites for proving premeditation and deliberation in every case, but rather was intended only as a framework to aid in appellate review) (citation and quotations omitted).

In support of his claim, Hunt argues that the manner of killing was ambiguous because one of the three shots did not hit Johnson and the gang rivalry motive supported an inference not of planning but rather of a "hasty and impetuous" nature of killing. But this argument simply points out inconsistencies in the evidence before the jury; all of the evidence he identifies in support of his claim was before the jury for its assessment. This Court is precluded from re-weighing the evidence. *Schlup*, 513 U.S at 330. As the Court of Appeal reasonably concluded:

> There was sufficient evidence from which the jury could find first degree murder. The evidence of gang rivalry as defendants' motive to kill Johnson was very strong. Hunt was armed and fired multiple shots at an unarmed victim. He then discussed whether Johnson was "still down" or should be shot again. Defendants gathered before the shooting, were together when they found and shot Johnson, and fled to the same place after the killing, indicative of planning and follow-through.

*Wallace*, 2014 WL 4783222, at *13.

Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence of premeditation and deliberation introduced at trial from which a rational trier of fact could have found beyond a reasonable doubt that Hunt was guilty of the first-degree murder of Johnson. Hunt is therefore not entitled to relief on his insufficiency of the evidence claim.

Ground 4.    *Instructional Error*

Hunt additionally argues that the trial court erred in instructing the jury on premeditation and deliberation after the jury announced it was deadlocked on first-degree murder. A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be

19

considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at

72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation." *Id*. at 73 (citation omitted).

Where the defect is the failure to give an instruction, the burden is even heavier because an

omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates

the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is

whether the trial court's refusal to give the requested instruction "so infected the entire trial that

the resulting conviction violates due process." *Id.* at 156-57; *Estelle*, 502 U.S. at 72.

The Court of Appeal considered and rejected Hunt's instructional error claim on direct

appeal as follows:

### A. Background

The trial court originally instructed the jury with CALCRIM No. 521 as follows:

"A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. [¶] The defendant acted willfully if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. [¶] The defendant acted with premeditation if he decided to kill before completing the act that caused death. [¶] The length of time a person spends considering whether he kills does not alone determine whether the killing is deliberate or premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] The decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. [¶] On the other hand, a cold calculating decision to kill can be reached quickly. [¶] The test is the extent of the reflection, not the length of time. [¶] The requirements for second degree murder, murder based on express or implied malice, are explained in CALCRIM 520, first or second degree murder with

malice aforethought. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

Hunt and Taylor's jury began deliberations on February 2, 2012.  On February 14, 2012, the jury announced it had reached a verdict on count 5 but could not reach a verdict on count 3, murder, for either defendant.  The court asked if any clarification of the instructions would assist the jury.  The foreperson responded, "The two words that are hanging everybody up are the 'deliberate' and 'premeditated.' [¶] . . . [¶] Mostly the latter."  The court indicated that counsel would work on providing some guidance.

The trial court proposed an additional instruction and submitted it to counsel.  The instruction was based, in part, on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), regarding the type of evidence that shows premeditation and deliberation.  Both Hunt and Taylor requested that the court read CALCRIM No. 521 again; Hunt wanted the court to add that absent evidence of Hunt's actions before the killing, there was no proof of premeditation and deliberation.

Both Taylor and Hunt objected to the court's proposed instruction.  Taylor objected to portions and suggested a number of changes.  If the court was to give its proposed instruction, Hunt insisted that "the balance of the *Anderson* definition of premeditation be given, i.e., . . . 'as a deliberate judgment or plan, carried on cooly and steadily, [especially] according to a preconceived plan.' "

The trial court incorporated Taylor's suggested changes, but not Hunt's. The court instructed the jury as follows:

"In response to your request for a further clarification of the terms 'premeditation and deliberation' contained in CalCrim 521, the court submits the following.

"Premeditation and deliberation is not synonymous with malice aforethought as defined in CalCrim 520.  In order for you to find the defendant guilty of First Degree Murder you must find that the defendant not only acted with the specific intent to kill but acted with premeditation and deliberation.

"Premeditation means to think on and resolve in the mind beforehand, to contrive and design previously, it implies deliberate judgment or plan according to a preconceived plan.  Although premeditation requires that the defendant decided to kill before completing the act that caused death, the time period for premeditation may be no greater than is necessary to form the intent to kill.  The formation of the intent to kill and the acts causing death may occur in rapid succession.  The test is not the period of time during which a thought must be pondered before it can ripen into an intent to kill which is premeditated but the extent of the reflection on the part of the defendant.

"The term 'deliberate' means that the defendant formed, arrived at, or determined the intent to kill as a result of careful thought and weighing

of considerations.  One who acts in haste, impetuously, rashly or impulsively does not act with deliberation.

       "The presence or absence of premeditation and deliberation may be determined from the consideration of both the direct and circumstantial evidence presented in this case.  'You may consider any evidence presented to you in this trial on the issue of premeditation and deliberation. Although you may consider any evidence presented to you in this trial on the issue of premeditation and deliberation, factors such as any pre-planning activity or motive, and the manner of killing, may be relevant to this issue.  As judges of the facts, you are to determine the presence or absence of any factors bearing on premeditation and deliberation.'

       "The people have the burden of proving the existence of premeditation and deliberation by proof beyond a reasonable doubt.  If the people have not met this burden, you must find the defendant not guilty of First Degree Murder."

       The jury reached verdicts the next day, finding Hunt guilty of first degree murder and Taylor of second degree murder.

## B. Analysis

       Hunt first contends that the trial court erred in declining to re-read CALCRIM No. 521.  He argues the jury's "difficulty" was not with the CALCRIM instruction, but with the "borderline" evidence on the question.

       Section 1138 provides in relevant part: "After the jury have [sic ] retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court.  Upon being brought into court, the information required must be given . . . ."  "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.]"  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]" (*Ibid.*)

       First, the trial court did not abuse its discretion by declining to repeat CALCRIM No. 521.  The court has no duty to give a repetitious instruction.  (*People v. Turner* (1994) 8 Cal.4th 137, 203.)  Nor did the court disregard its duty to assist the jury; it did so by crafting a clarifying instruction with counsels' input.

       Hunt next contends the court's instruction "conflated the definition of premeditation and deliberation with the probative value and sufficiency of the evidence in that regard."  He contends the instruction given was an improper pinpoint instruction, favoring the prosecution by highlighting certain evidence, namely pre-planning activity, motive, and manner of killing.

22

An improper pinpoint instruction is one that implies certain conclusions from specified evidence. (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.) The clarifying instruction told the jury it could "consider any evidence presented to you in this trial on the issue of premeditation and deliberation." While the instruction suggested evidence of "any pre-planning activity or motive, and the manner of killing, may be relevant to this issue," nothing in the instruction implied that the jury should draw a particular conclusion from this evidence. Indeed, Hunt has argued consideration of those factors shows insufficient evidence of premeditation and deliberation in this case. (See Part III A *ante*.)

Hunt faults the clarifying instruction for its failure to focus the jury on the "extent of deliberation," an error he claims was compounded by the trial court's refusal to add the additional language from *Anderson* he requested. He points especially to the portion of the instruction that stated, "the time period for premeditation may be no greater than is necessary to form the intent to kill." The clarifying instruction, however, made clear that the test was not time, but the extent of reflection. "The test is not the period of time during which a thought must be pondered before it can ripen into an intent to kill which is premeditated but the extent of the reflection on the part of the defendant."

In reviewing a challenge to an individual jury instruction for correctness or completeness, we evaluate the instructions given as a whole, not in isolation, to determine whether there is a reasonable likelihood they confused or misled the jury and thereby denied the defendant a fair trial. (*People v. Letner* and *Tobin* (2010) 50 Cal.4th 99, 182.) Here, both instructions on premeditation and deliberation, CALCRIM No. 521 and the clarifying instruction, stressed the key issue was defendant's extent of reflection. The clarifying instruction told the jury, "Premeditation means to think on and resolve in the mind beforehand, to contrive and design previously, it implies deliberate judgment or plan according to a preconceived plan." Hunt has failed to show error in the clarifying instruction on premeditation and deliberation.

*Wallace*, 2014 WL 4783222, at *18-21.

The Court finds no basis for disagreeing with the California Court of Appeal's conclusion that the trial court did not err when it instructed the jury on premeditation and deliberation after it announced that it was deadlocked. As the appellate court reasonably concluded, Hunt cannot establish that the instructions as given rendered his trial fundamentally unfair in light of the instructions as a whole.

Moreover, Hunt cites no federal law compelling the provision of instructions in the manner he requested and indeed cites only state law in support of his claim. However, "the fact

that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").  Claims of error in state jury instructions are generally a matter of state law that do not usually invoke a constitutional question.  *Gilmore v. Taylor*, 508 U.S. 333, 342-43 (1993).  This Court is bound by the state appellate court's determination that the trial court did not err with respect to the instructions, in the absence of any due process violation.  Hunt fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights.  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted).  Accordingly, Hunt's instructional error claim must fail.

<u>Ground 5.</u>    *Gang Expert Testimony on Ultimate Issue*

Finally, Hunt argues that the trial court erred in admitting certain portions of the gang expert's testimony.  Under California law, expert testimony on criminal street gangs is admissible to prove the elements of the criminal street gang substantive offense and the gang enhancement.  *See People v. Jasso*, 150 Cal. Rptr. 3d 464, 484 (Cal. Ct. App. 2012) (relying on expert testimony in part to support a conviction for the substantive offense); *see also People v.*

*Hernandez*, 94 P.3d 1080, 1085 (Cal. 2004) ("In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs.").  Hunt nonetheless argues it was error to admit the gang expert's testimony that the homicide was gang-related and there was no other motive for the killing because those opinions improperly invaded the province of the jury on an ultimate issue in the case.

Hunt argues that this testimony violated state law, but federal habeas relief is not available for errors of state law.  *Estelle*, 502 U.S. at 67-68.  He additionally argues that the testimony deprived him of due process in violation of federal law, but under federal law, there is no support for "the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009).  "[I]t is 'well-established . . . that expert testimony concerning an ultimate issue is not per se improper.'  Although '[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact.'" *Id.* (internal citations omitted); *see also Duvardo v. Giurbino*, 410 F. App'x 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Briceno v. Scribner*, 555 F.3d 1069, 1077-78 (9th Cir. 2009) (rejecting claim that gang expert's testimony that "the crimes [the defendants] were involved in benefit the gang itself, the action that they have done to glorify the gang" was unconstitutional because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue").  Hunt is therefore not entitled to relief on this claim.

## V. CONCLUSION AND ORDER

Hunt is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 8, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge